# EXHIBIT A

Case 1:24-cv-06108-RA   Document 1-1   Filed 08/12/24   Page 2 of 58

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

| | |
|---|---|
| ANTOINE KEANE,<br><br>              Plaintiff,<br><br>      v.<br><br>EARLY WARNING SERVICES, LLC dba EARLY WARNING; KEYBANK NATIONAL ASSOCIATION dba KEYBANK and KEY BANK; KEYCORP dba KEYBANK and KEY BANK; FORD MOTOR CREDIT COMPANY LLC dba FORD CREDIT; TRANS UNION (OF DELAWARE), LLC dba TRANSUNION;<br><br>             Defendants. | Index No.<br><br>**VERIFIED COMPLAINT AND JURY DEMAND**<br><br>Date Index No. Purchased: |

## I.    INTRODUCTION

1.     This is a civil action for actual damages, statutory damages, punitive damages, costs, attorney's fees, and declaratory relief brought by Plaintiff ANTOINE KEANE (hereinafter referred to as "Plaintiff" or "Mr. Keane"), an individual, against Defendants EARLY WARNING SERVICES, LLC dba EARLY WARNING ("Early Warning" or "Early Warning Services" or "EWS"), KEYBANK NATIONAL ASSOCIATION dba KEYBANK and KEY BANK ("KeyBank" or "KeyBank N.A."), KEYCORP dba KEYBANK and KEY BANK ("KeyCorp"), FORD MOTOR CREDIT COMPANY LLC dba FORD CREDIT ("Ford Credit"), and TRANS UNION (OF DELAWARE), LLC dba TRANSUNION ("TransUnion") (collectively hereinafter referred to as the "Defendants"), all artificial persons or entities, for violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.* ("FCRA"), New York Fair Credit Reporting Act [General Business Law ("GBL") Art. 25 § 380, *et seq.*] ("NYFCRA"), New York Deceptive Practices Act, NY GBL Art. 22-A, § 349, and New York defamation (libel) law.

*The Fair Credit Reporting Act ("FCRA")*

2.      The Fair Credit Reporting Act ("FCRA") is federal legislation enacted to promote the accuracy, fairness, and privacy of consumer information contained in the files of consumer reporting agencies.

3.      Further, the Fair Credit Reporting Act is a federal law designed to regulate the collection, dissemination, and use of consumer credit information.

4.      Enacted in 1970 and amended multiple times since, the Fair Credit Reporting Act aims to protect consumers' privacy and ensure the accuracy of information in their consumer reports.

5.      Key provisions of the Fair Credit Reporting Act include:

   a. *Access to Credit Reports*: Consumers have the right to access their credit reports from consumer reporting agencies ("CRAs") and can request one free report annually from each major consumer reporting agency;

   b. *Accuracy and Dispute Process*: Consumer reporting agencies must maintain reasonable procedures to ensure the accuracy of the information in consumer reports. Consumers have the right to dispute inaccurate or incomplete information and have it corrected or deleted from their files with consumer reporting agencies and their consumer reports;

   c. *Consumer Consent*: Generally, consumer consent is required for the release of their consumer report to third parties, except in cases permitted by law (e.g., for employment or insurance purposes);

   d. *Adverse Action Notices*: If adverse actions (like denial of credit or employment) are taken based on information in a consumer report, the

Case 1:24-cv-06108-RA   Document 1-1   Filed 08/12/24   Page 4 of 58

consumer must be notified and provided with specific information, including the CRA that provided the consumer report;

e. *Data Security and Integrity*: CRAs and entities that furnish information to consumer reporting agencies must take measures to ensure the confidentiality, accuracy, and security of consumer information; and

f. *Enforcement*: The Fair Credit Reporting Act allows consumers to sue consumer reporting agencies and furnishers of information for violations of its provisions. It also provides for enforcement by federal regulatory agencies such as the Consumer Financial Protection Bureau ("CFPB") and the Federal Trade Commission ("FTC").

6.   Overall, the Fair Credit Reporting Act sets forth guidelines to promote fairness, transparency, and the responsible use of consumer credit information, aiming to protect consumers from inaccurate information that could impact their financial opportunities and well-being.

*New York Fair Credit Reporting Act ("NY FCRA")*

7.   The New York Fair Credit Reporting Act ("NY FCRA" or "NYFCRA") is a state-level legislation aimed at regulating the use and dissemination of consumer credit information.

8.   Enacted to protect consumers' privacy and ensure fair and accurate credit reporting, the New York Fair Credit Reporting Act mandates that consumer reporting agencies ("CRAs") maintain reasonable procedures to ensure the accuracy of the information they collect and distribute.

9.   Key provisions of the New York Fair Credit Reporting Act include:

    a.   *Consumer Rights*: Individuals have the right to obtain a copy of their file from consumer reporting agencies upon request and to dispute inaccurate information;

    b.   *Disclosure Requirements*: Consumer reporting agencies must disclose to consumers the sources of information they collect and provide details about who has requested their consumer report;

    c.   *Data Security*: Consumer reporting agencies must implement procedures to protect the confidentiality and security of consumer information;

    d.   *Adverse Action Notices*: When adverse actions (such as denial of credit or employment) are taken based on information in a consumer report, individuals must be notified and provided with information on how to obtain a free copy of their file; and

    e.   *Statute of Limitations*: Establishes a timeframe within which consumers can take legal action against consumer reporting agencies for violations of the New York Fair Credit Reporting Act.

10.    Overall, the New York Fair Credit Reporting Act aims to promote fairness, transparency, and accuracy in credit reporting practices within the state of New York, ensuring that consumers have recourse if their rights are violated.

*New York Deceptive Practices Act*

11.    The New York Deceptive Practices Act, also known as General Business Law Article 22-A, aims to protect consumers and businesses from fraudulent and deceptive practices in trade and commerce.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

12.    Enacted to promote fair competition and ensure transparency, the New York Deceptive Practices Act prohibits various deceptive acts and practices, including false advertising, fraud, and other dishonest business practices.

13.    Key elements of the New York Deceptive Practices Act include:

   a. *Prohibited Practices*: The New York Deceptive Practices Act defines specific deceptive acts that are unlawful, such as false advertising, bait-and-switch tactics, pyramid schemes, and misleading representations about the nature, quality, or price of goods or services;

   b. *Consumer Protection*: The New York Deceptive Practices Act provides consumers with legal remedies and protections against deceptive practices, allowing them to seek damages, restitution, and injunctions against offending businesses;

   c. *Business Obligations*: Businesses are required to adhere to truth-in-advertising principles, ensuring that all claims made about their products or services are accurate and substantiated. They must also disclose material facts that could influence consumers' purchasing decisions;

   d. *Enforcement*: The New York Attorney General's Office has authority to investigate and prosecute violations of the New York Deceptive Practices Act. Private individuals may also bring civil actions against violators, seeking remedies under the New York Deceptive Practices Act; and

   e. *Penalties*: Violators of the New York Deceptive Practices Act may face civil penalties, fines, and injunctions, depending on the severity and frequency of their deceptive practices.

14.    Overall, the New York Deceptive Practices Act serves to safeguard consumers from fraudulent business practices and promotes fair and honest competition in the marketplace within the state of New York.

15.    The New York Deceptive Practices Act emphasizes transparency and accountability among businesses while providing legal recourse for consumers who have been harmed by deceptive conduct.

*New York defamation law*

16.    New York defamation law encompasses the legal principles and statutes governing the protection of an individual's reputation from false statements that harm their character or professional standing.

17.    Key elements of New York defamation law include:

a.    *Defamation Types*: New York recognizes two types of defamation: *libel* and *slander*.

- Libel refers to written or published false statements.

- Slander refers to spoken false statements.

b.    *Defamation Elements*: To prove defamation in New York, the plaintiff (the person claiming defamation) must demonstrate that the defendant (the person accused of defamation) made a false and defamatory statement about them, which was published to a third party (meaning it was communicated to someone other than the plaintiff), and that caused harm to the plaintiff's reputation or defamation per se. *See, e.g., Dillion v. City of New York*, 261 A.D.2d 34, 38 (N.Y.A.D. 1 Dept. 1999).

    c. *Fault Requirements*: Depending on whether the plaintiff is a public figure or a private individual, different standards of fault apply.

- Public figures, including public officials and celebrities, must prove that the defendant acted with actual malice—knowledge that the statement was false or with reckless disregard for its truth.
- Private individuals need to show only negligence on the part of the defendant. *Id.*

    d. *Defenses*: Defenses to defamation claims in New York include:

- truth (if the statement is true, it cannot be defamatory);
- statements made in a privileged context (such as statements made in court proceedings or certain legislative hearings); and
- the fair reporting privilege (which allows journalists to report on certain official proceedings without fear of defamation liability).

    e. *Damages*: If defamation (libel or slander) is proven, damages may include compensation for harm to the plaintiff's reputation, emotional distress, and in some cases, punitive damages if the defendant's conduct was particularly egregious.

    f. *Statute of Limitations*: In New York, the statute of limitations for defamation claims is generally one (1) year from the date the defamatory statement was made or published. *See* NY CPLR § 215(3).

18. New York defamation law aims to balance the protection of individuals' reputations with the principles of free speech, ensuring that defamatory statements are actionable only when they meet strict legal criteria and have caused demonstrable harm.

## II.    JURISDICTION AND VENUE

19.    This is an action to enforce liability under the FCRA in a court of competent jurisdiction.

20.    This action is filed within two (2) years after the date of discovery by Plaintiff of the alleged FCRA violation that is the basis for such liability.

21.    The instant civil action is filed in the Supreme Court of the State of New York, New York County.

22.    The Supreme Court of the State of New York, New York County, is a court of competent jurisdiction.

23.    Jurisdiction of this court arises under 15 U.S.C. § 1681p.

24.    15 U.S.C. § 1681p provides:

>    An action to enforce any liability created under this subchapter may be brought in any appropriate United States district court, without regard to the amount in controversy, or in any other court of competent jurisdiction, not later than the earlier of—(1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs.

25.    Plaintiff resides in New York County, New York City, New York.

26.    Venue is proper in New York County, New York.

27.    Venue is proper in New York County, New York, pursuant to the provisions of NY CPLR § 503(a).

28.    NY CPLR § 503(a) provides:

>    Generally. Except where otherwise prescribed by law, the place of trial shall be in the county in which one of the parties resided when it was commenced; the county in which a substantial part of the events or omissions giving rise to the claim occurred; or, if none of the parties resided in the state, in any county designated by the plaintiff. A party resident in more than one county shall be deemed a resident of each such county.

### III.    THE PARTIES

#### *Plaintiff ANTOINE KEANE ("Plaintiff" or "Mr. Keane")*

29.    Plaintiff is an individual and natural person over the age of eighteen (18) years.

30.    Plaintiff is a "consumer" as defined under 15 U.S.C. § 1681a(c).

31.    15 U.S.C. § 1681a(c) states, "The term 'consumer' means an individual."

32.    Plaintiff is a "consumer" as defined under NY GBL § 380-A(b).

33.    NY GBL § 380-A(b) states, "The term 'consumer' means an individual."

#### *Defendant EARLY WARNING SERVICES, LLC dba EARLY WARNING ("Early Warning" or "Early Warning Services" or "EWS")*

34.    Upon information and belief, Defendant EARLY WARNING SERVICES, LLC dba EARLY WARNING ("Early Warning" or "Early Warning Services" or "EWS") is a prominent company specializing in fraud prevention and risk management solutions for financial institutions, businesses, and government entities.

35.    Upon information and belief, established in 1990 and based in Scottsdale, Arizona, Early Warning Services operates as a privately held limited liability company (LLC).

36.    Upon information and belief, Early Warning's company's core mission revolves around providing innovative technology and services to mitigate fraud, enhance security, and improve operational efficiency across various sectors.

37.    Upon information and belief, Early Warning is known for its robust platforms and solutions that enable real-time decision-making, identity verification, account authentication, and risk assessment.

38.    Upon information and belief, Key offerings and capabilities of Early Warning Services include:

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1                                              RECEIVED NYSCEF: 07/08/2024

a.  Fraud Prevention Solutions: Early Warning offers advanced fraud detection and prevention tools that help organizations detect and mitigate various types of fraud, including identity theft, account takeover, and payment fraud.

b.  Identity Verification: The company provides identity verification services that help businesses and financial institutions authenticate the identity of individuals applying for accounts or transactions.

c.  Payment Solutions: Early Warning facilitates secure and efficient payment processing solutions, including real-time payment capabilities through its Zelle® network, enabling fast and reliable person-to-person (P2P) and business-to-consumer (B2C) payments.

d.  Risk Management:** The company offers comprehensive risk management services, leveraging data analytics and machine learning to assess and manage risks associated with financial transactions and customer interactions.

e.  'Compliance Services: Early Warning supports regulatory compliance efforts by providing solutions that help organizations adhere to anti-money laundering (AML) and know your customer (KYC) regulations.

f.  Collaboration:** Early Warning collaborates with financial institutions, technology partners, and industry stakeholders to innovate and develop new solutions that address evolving fraud and security challenges.

39.  Upon information and belief, overall, Early Warning Services plays a crucial role in safeguarding financial transactions, enhancing consumer protection, and promoting secure and efficient financial services in the digital age.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1                                                RECEIVED NYSCEF: 07/08/2024

40. Upon information and belief, with its extensive experience and technological expertise, Early Warning continues to be a leader in the field of fraud prevention and risk management solutions.

41. Early Warning is not a natural person.

42. Early Warning is an artificial person.

43. Early Warning is a foreign limited liability company.

44. Early Warning's New York Department of State ("NY DOS") ID is 4097949.

45. Early Warning's Section of Law is 802 LLC – LIMITED LIABILITY COMPANY LAW.

46. Early Warning's Entity Status with the New York Department of State is Active.

47. Early Warning's Date of Initial New York Department of State Date of Initial Filing is 05/23/2011.

48. Early Warning's Effective Date Initial Filing with the New York Department of State is 05/23/2011.

49. Early Warning's foreign formation date as listed with the NY DOS is 06/01/1995.

50. Early Warning's Statement Status with the New York Department of State is Current.

51. Early Warning listed Albany County in its application with the NY DOS.

52. Early Warning's Next Statement Due Date with the NY DOS as 05/31/2025.

53. Early Warning's Registered Agent's Name and Address is NATIONAL CORPORATE RESEARCH, LTD., 122 EAST 42ND STREET, 18TH FLOOR, NEW YORK, NY 10168.

54. Early Warning is a "person" as defined under 15 U.S.C. § 1681a(b).

55.     15 U.S.C. § 1681a(b) states, "The term 'person' means any individual, partnership, corporation, trust, estate, cooperative, association, government or governmental subdivision or agency, or other entity."

56.     Upon information and belief, Early Warning for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports.

57.     Early Warning is a "consumer reporting agency" as defined under 15 U.S.C. § 1681a(f).

58.     Early Warning is a "consumer credit reporting agency" as defined under NY GBL § 380-A(k).

59.     15 U.S.C. § 1681a(f) states, "The term 'consumer reporting agency' means any person, which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports."

60.     Upon information and belief, EWS assists financial institutions, check acceptance companies such as retail merchants, payment processors, and other financial entities in detecting and preventing fraud associated with bank accounts and payment transactions.

61.     Upon information and belief, Defendant Early Warning is co-owned by Bank of America, Capital One, JPMorgan Chase, PNC Bank, Truist, U.S. Bank and Wells Fargo.

Case 1:24-cv-06108-RA    Document 1-1    Filed 08/12/24    Page 14 of 58

### Defendant KEYBANK NATIONAL ASSOCIATION dba KEYBANK and KEY BANK ("KeyBank")

62.    KeyBank is an artificial person.

63.    KeyBank is a national association.

64.    Upon information and belief, KeyBank is FDIC Insured since 01/16/1956.

65.    Upon information and belief, KeyBank's FDIC Cert # is 17534.

66.    Upon information and belief, KeyBank's FDIC Unique Number (UNINUM) IS 11510.

67.    Upon information and belief, KeyBank's FRB ID (RSS-ID) is 280110.

68.    Upon information and belief, KeyBank's FRB ID for Bank Holding Company (RSSDHCR) is 1068025.

69.    Upon information and belief, KeyBank's OCC Charter Number (CHARTER) is 14761.

70.    Upon information and belief, KeyBank was established 01/01/1849.

71.    Upon information and belief, KeyBank's Bank Charter Class is National Banks, member of the Federal Reserve System (FRS).

72.    Upon information and belief, KeyBank's Primary Federal Regulator is Comptroller of the Currency.

73.    Upon information and belief, KeyBank's Secondary Federal Regulator is the CFPB.

74.    Upon information and belief, KeyBank's Main Office Address is 127 Public Square, Cleveland, OH 44114.

75.    Upon information and belief, KeyBank's Primary Website is www.key.com.

76.    Upon information and belief, KeyBank's locations include 973 domestic locations in 16 states and 0 territories; 0 in foreign countries.

77.    Upon information and belief, KeyBank's Prior Names include Keybank National Association, Society National Bank, and Society National Bank of Cleveland.

78. Upon information and belief, KeyBank is the primary subsidiary of KeyCorp.

79. Upon information and belief, KeyBank is ranked 449th on the 2022 Fortune 500 list based on its 2021 revenue.

80. Upon information and belief, KeyBank is 25th on the list of largest banks in the U.S.

81. Upon information and belief, KeyBank's customer base spans retail, small business, corporate, commercial, and investment clients.

82. Upon information and belief, KeyBank maintains over 1,000 branches and over 40,000 ATMs, which are in over 15 states: Alaska, Colorado, Connecticut, Delaware, Florida, Idaho, Illinois, Indiana, Iowa, Maine, Maryland, Massachusetts, Michigan, Minnesota, New Jersey, New York, Ohio, Oregon, Pennsylvania, Rhode Island, Texas, Utah, Vermont, Virginia, Washington, D.C., and Washington.

83. Upon information and belief, KeyBank was formed in 1994 through the merger of Society Corporation of Cleveland of Cleveland, Ohio ("Society Bank") and KeyCorp ("Old KeyCorp") of Albany, New York. Upon information and belief, this merger briefly made KeyBank the 10th largest U.S. bank.

84. Upon information and belief, KeyBank's roots trace back to Commercial Bank of Albany, New York in 1825 and Cleveland's Society for Savings, founded in 1849.

85. Upon information and belief, KeyBank continues to play an important role in the regional economy of Cleveland, having 6,400 employees.

86. Upon information and belief, KeyBank in 2019 announced that it will be opening its first tellerless branch on May 13, 2019, in Boulder, Colorado. Upon information and belief, instead of teller lines, the KeyBank branch features private offices where clients can interact with bankers trained as "financial wellness consultants."

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

87. Upon information and belief, in 2019, Christopher Gorman was appointed KeyBank's president.

88. Upon information and belief, in 2021, KeyBank originated 52,366 mortgages worth $25 billion (~$27.7 billion in 2023).

89. Upon information and belief, KeyBank provided $21 Million in financing options for seniors in a senior housing initiative based in New York in June of 2023.

90. Upon information and belief, KeyBank owns corporate naming rights to the following: (1) KeyBank Center in Buffalo, New York. KeyBank acquired the naming rights as part of its purchase of First Niagara. The arena is home to the Buffalo Sabres of the National Hockey League (NHL); (2) On April 11, 1995, the city of Seattle, Washington sold the naming rights to KeyCorp for $15.1 million, which renamed the Coliseum as KeyArena. In March 2009, he city and KeyCorp signed a new deal for a two-year term that ended December 31, 2010, at an annual fee of $300,000. The building maintained the KeyArena name until its 2018 closure; the building is now known as the Climate Pledge Arena.

91. Upon information and belief, KeyBank is a sponsor of: Akron RubberDucks – Official Bank of the Akron RubberDucks; Buffalo Sabres – Official Bank & Private Bank of the Buffalo Sabres; Buffalo Bisons – Official Bank of the Buffalo Bisons; Seattle Mariners – Official Bank of the Seattle Mariners; Villanova University – Official Bank of Villanova University Athletics; Pittsburgh Penguins – Official Bank of the Pittsburgh Penguins; Colorado Avalanche – Official Banking Partner of the Colorado Avalanche; Denver Nuggets – Official Banking Partner of the Denver Nuggets; Indiana Pacers – Official Banking Partner of the Indiana Pacers; and Portland Timbers – Official Banking Partner of the Portland Timbers.

### *Defendant KEYCORP dba KEYBANK and KEY BANK ("KeyCorp")*

92. Upon information and belief, KeyCorp operates as the holding company for KeyBank National Association that provides various retail and commercial banking products and services in the United States.

93. Upon information and belief, KeyCorp operates in two (2) segments, Consumer Bank and Commercial Bank.

94. Upon information and belief, KeyCorp offers various deposits, investment products and services; commercial leasing, investment management, consumer finance; and personal finance and financial wellness, student loan refinancing, mortgage and home equity, lending, credit card, treasury, business advisory, wealth management, asset management, cash management, portfolio management, and trust and related services to individuals and small and medium-sized businesses.

95. Upon information and belief, KeyCorp also provides a suite of banking and capital market products, such as syndicated finance, debt and equity capital market products, commercial payments, equipment finance, commercial mortgage banking, derivatives, foreign exchange, financial advisory, and public finance, as well as commercial mortgage loans to consumer, energy, healthcare, industrial, public sector, real estate, and technology sectors for middle market clients.

96. Upon information and belief, in addition, KeyCorp offers community development financing, securities underwriting, brokerage, and investment banking services.

97. Upon information and belief, KeyCorp was founded in 1849 and is headquartered in Cleveland, Ohio.

98. KeyCorp is an artificial person.

99.  KeyCorp Entity Type as listed with the NY DOS is a Domestic Business Corporation.

100.  KeyCorp's Entity Status as listed with the NY DOS is Active.

101.  KeyCorp is registered with the NY DOS with a Date of Initial DOS Filing of 06/02/1983.

102.  KeyCorp has a NY DOS Effective Date Initial Filing of 06/02/1983.

103.  KeyCorp's Statement Status with the NY DOS is Past Due Date.

104.  KeyCorp is registered with the NY DOS under the following county: ALBANY.

105.  KeyCorp's Next Statement Due Date with the NY DOS is 06/30/1994.

106.  KeyCorp's Jurisdiction as registered with the NY DOS is NEW YORK.

107.  KeyCorp's NY DOS ID # is 845728.

108.  KeyCorp's Registered Agent's Name and Address as registered with the NY DOS is CORPORATION SERVICE COMPANY, 80 State Street, Albany, NY 12207-2543.

109.  Upon information and belief, KeyCorp's Chief Executive Officer's Name and Address, as registered with the NY DOS as of the date of this filing, is JOHN M. LANG, KEYCORP, ONE KEYCORP PLAZA, ALBANY, NY 12201-0088.

110.  Upon information and belief, KeyCorp's Principal Executive Office Address is 60 STATE ST, ALBANY, NY 12201-0088.

111.  Upon information and belief, KeyCorp's Chairman of the Board, President, and Chief Executive Officer is Christopher Gorman.

112.  Upon information and belief, KeyCorp's Chief Financial Officer is Clark Khayat.

113.  Upon information and belief, KeyCorp's Chief Information Officer is Amy Brady.

114.  Upon information and belief, KeyCorp's Chief Account Officer is Stacy Gilbert.

115.  Upon information and belief, KeyCorp's General Counsel, Executive Officer, and Company Secretary is James Waters.

*Defendant FORD MOTOR CREDIT COMPANY LLC dba FORD CREDIT ("Ford Credit")*

116.    Upon information and belief, Defendant FORD MOTOR CREDIT COMPANY LLC dba FORD CREDIT ("Ford Credit") is the financial services arm of Ford Motor Company ("Ford"), and is headquartered in Dearborn, Michigan.

117.    Upon information and belief, the predominant share of Ford Credit's business consists of financing Ford and Lincoln vehicles and supporting Ford and Lincoln dealers.

118.    Upon information and belief, specifically, Ford Credit's business activities are concentrated in the area of automobile financing for consumers and dealership inventory and leasing.

119.    Upon information and belief, Ford Credit competes mainly on the basis of service and financing rate programs, including those sponsored by Ford.

120.    Upon information and belief, a key foundation of Ford Credit's service is providing broad and consistent purchasing policies for retail installment sale and lease contracts, and consistent support for dealer financing requirements across economic cycles.

121.    Upon information and belief, these above-listed policies have helped Ford Credit build strong relationships with Ford's dealer network that enhance competitiveness.

122.    Upon information and belief, Ford Credit also provides commercial financing and lines of credit to dealerships selling Ford Motor Company products.

123.    Upon information and belief, Ford Credit also issues commercial paper and other debt instruments on Ford's behalf

124.    Upon information and belief, Ford Credit also owns Lincoln Automotive Financial Services, the arm that finances Lincoln vehicles.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 07/08/2024

125. Upon information and belief, Ford Credit also issues commercial paper and other debt instruments on Ford's behalf; Ford earned $2.63 billion EBIT with its Ford Credit segment in 2018, up from $2.31 billion in 2017. 2018 was the segment's highest full-year EBT in eight years. This upward trend may not last long as car sales decline.

126. Upon information and belief, Ford Credit also issues commercial paper and other debt instruments on Ford's behalf Ford Credit's ROE, which fell from 22% in 2017 to 14% in 2018 forecasts the segment's coming decline.

127. Upon information and belief, Ford Credit is an artificial person.

128. Upon information and belief, Ford Credit's NY DOS ID # is 3510879.

129. Upon information and belief, Ford Credit is registered with the NY DOS as a FOREIGN LIMITED LIABILITY COMPANY.

130. Upon information and belief, Ford Credit is registered with the NY DOS under 802 LLC – LIMITED LIABILITY COMPANY LAW.

131. Upon information and belief, Ford Credit's Entity Status with the NY DOS is Active.

132. Upon information and belief, Ford Credit's NY DOS Date of Initial Filing of 05/01/2007.

133. Upon information and belief, Ford Credit's NY DOS Foreign Formation Date and has an Effective Date Initial Filing of 05/01/2007.

134. Upon information and belief, Ford Credit's NY DOS Statement Status is Current.

135. Upon information and belief, Ford Credit's county registered with the NY DOS is Suffolk.

136. Upon information and belief, Ford Credit's NY DOS Next Statement Due Date is 05/31/2025.

137. Upon information and belief, Ford Credit's Registered Agent's Name and Address is C T CORPORATION SYSTEM, 28 LIBERTY ST., NEW YORK, NY 10005.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

### Defendant TRANS UNION (OF DELAWARE), LLC dba TRANSUNION ("TransUnion")

138.  Upon information and belief, Defendant TRANS UNION (OF DELAWARE), LLC aka TRANS UNION LLC dba TRANSUNION ("TransUnion") is a foreign limited liability company.

139.  Upon information and belief, TransUnion is an American consumer reporting agency ("CRA").

140.  Upon information and belief, TransUnion collects and aggregates information on over one billion individual consumers in over thirty countries including 200 million files profiling nearly every credit-active consumer in the United States.

141.  Upon information and belief, TransUnion's customers include over 65,000 businesses.

142.  Upon information and belief, based in Chicago, Illinois, TransUnion's 2014 revenue was US$1.3 billion.

143.  Upon information and belief, TransUnion is the smallest of the three largest credit agencies, along with Experian and Equifax (known as the "Big Three").

144.  Upon information and belief, TransUnion also markets consumer reports (also known as "credit reports") and other credit and fraud-protection products directly to consumers.

145.  Upon information and belief, like all credit reporting agencies, TransUnion is required by U.S. law to provide consumers with one free credit report every year.

146.  Upon information and belief, additionally, a growing segment of TransUnion's business is its business offerings that use advanced big data, particularly its deep AI-TLOxp product.

*TransUnion's History*

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

147.    Upon information and belief, TransUnion was originally formed in 1968 as a holding company for Union Tank Car Company, making TransUnion a descendant of Standard Oil through Union Tank Car Company.

148.    Upon information and belief, the following year, TransUnion acquired the Credit Bureau of Cook County, which possessed and maintained 3.6 million credit accounts.

149.    Upon information and belief, in 1981, a Chicago-based holding company, The Marmon Group, acquired TransUnion for approximately $688 million.

150.    Upon information and belief, in 2010, Goldman Sachs Capital Partners and Advent International acquired TransUnion from Madison Dearborn Partners.

151.    Upon information and belief, in 2014, TransUnion acquired Hank Asher's data company TLO.

152.    Upon information and belief, on June 25, 2015, TransUnion became a publicly traded company for the first time, trading under the symbol TRU.

153.    Upon information and belief, TransUnion eventually began to offer products and services for both businesses and consumers.

154.    Upon information and belief, for businesses, TransUnion updated its traditional credit score offering to include trended data that helps predict consumer repayment and debt behavior. Upon information and belief, that product, referred to as CreditVision, launched in October 2013.

155.    Upon information and belief, TransUnion's SmartMove™ service facilitates credit and background checks for landlords. Upon information and belief, the service also provides credit and background checks for partner companies, such as RentSpree.

156.  Upon information and belief, in September 2013, the company acquired eScan Data
      Systems of Austin, Texas, to provide post-service eligibility determination support to
      hospitals and healthcare systems. Upon information and belief, the technology was
      integrated into TransUnion's ClearIQ platform, which tracks patients demographic and
      insurance related information to support benefit verification.

157.  Upon information and belief, in November 2013, TransUnion acquired TLO LLC, a
      company that leverages data in support of its investigative and risk management tools.
      Upon information and belief, its TLOxp technology aggregates data sets and uses a
      proprietary algorithm to uncover relationships between data. Upon information and belief,
      TLOxp also allows licensed investigators and law enforcement professionals to access
      personally identifiable information from credit header data.

158.  Upon information and belief, in 2014, a TransUnion analysis found that reporting rental
      payment information to credit bureaus can positively affect credit scores. Upon
      information and belief, as a result, TransUnion initiated a service called ResidentCredit,
      making it easy for property owners to report data about their tenants on a monthly basis.
      Upon information and belief, these reports include the amount each tenant pays, the
      timeliness of their last payment, and any remaining balance the tenant currently owes.
      Upon information and belief, as a result, some companies have started reporting rent
      payment information to TransUnion.

159.  Upon information and belief, in 2015, TransUnion acquired Trustev, a digital verification
      company specializing in online fraud for $21 million, minus debts.

160.  Upon information and belief, in 2017, TransUnion acquired FactorTrust, a consumer
      reporting agency specializing in alternative credit data.

161.   Upon information and belief, in mid-April 2018, TransUnion announced it intended to buy UK-based CallCredit Information Group for $1.4 billion, subject to regulatory approval.

162.   Upon information and belief, in December 2021, TransUnion completed the acquisitions of Neustar, initially announced in September 2021 for $3.1 billion, and Sontiq, initially announced in October 2021 for $638 million.

163.   Upon information and belief, in February 2023, TransUnion announced it was rebranding its "thousands of existing B2B products into seven business lines." These include: TruAudience, TruValidate, TruContact (all based on former offerings from Neustar), TruVision, TruIQ, TruEmpower, and TruLookup.

*TransUnion's Legal and regulatory issues*

164.   Upon information and belief, in 2003, Judy Thomas of Klamath Falls, Oregon, was awarded $5.3 million in a successful lawsuit against TransUnion. Upon information and belief, the award was made on the grounds that it took her six years to get TransUnion to remove incorrect information in her consumer report a.k.a. credit report.

165.   Upon information and belief, in 2006, after spending two years trying to correct erroneous credit information that resulted from being a victim of identity theft, a fraud victim named Sloan filed suit against all three of the US's largest credit agencies. Upon information and belief, TransUnion and Experian settled out of court for an undisclosed amount. Upon information and belief, in *Sloan v. Equifax*, a jury awarded Sloan $351,000. Upon information and belief, "She wrote letters. She called them. They saw the problem. They just didn't fix it," said her attorney, A. Hugo Blankingship III.

166.   Upon information and belief, TransUnion has also been criticized for concealing charges.

INDEX NO. 156169/2024
NYSCEF DOC. NO. 1 RECEIVED NYSCEF: 07/08/2024

167. Upon information and belief, many TransUnion users complained of not being aware of a $17.95/month charge for holding a TransUnion account.

168. Upon information and belief, in March 2015, following a settlement with the New York Attorney-General, TransUnion, along with other credit reporting companies, Experian and Equifax, agreed to help consumers with errors and red flags on credit reports. Upon information and belief, under the new settlement, credit-reporting firms are required to use trained employees to respond when a consumer flags a mistake on their file. Upon information and belief, these employees are responsible for communicating with the lender and resolving the dispute.

169. Upon information and belief, in January 2017, TransUnion was fined $5.5 million and ordered to pay $17.6 million in restitution, along with Equifax, by the Consumer Financial Protection Bureau (the "CFPB").

170. Upon information and belief, the Consumer Financial Protection Bureau fined TransUnion and Equifax "for deceiving consumers about the usefulness and actual cost of credit scores they sold to consumers."

171. Upon information and belief, the Consumer Financial Protection Bureau also said TransUnion and Equifax "lured consumers into costly recurring payments for credit-related products with false promises."

172. Upon information and belief, consumer reporting agencies had the most complaints of all companies filed with the Consumer Financial Protection Bureau by consumers in 2018, with 34% of all complaints directed at TransUnion, Equifax, and Experian that year.

173. Upon information and belief, in June 2017, a California jury ruled against TransUnion with a $60 million verdict in the largest Fair Credit Reporting Act verdict in history. Upon

information and belief, the San Francisco federal court jury awarded $60 million in damages to consumers who were falsely reported on a government list of terrorists and other security threats. Upon information and belief, the plaintiffs' team of attorneys at Francis & Mailman, P.C. partnered with another California-based firm in the class action. Upon information and belief, following up on this, in April 2022, the Consumer Financial Protection Bureau said TransUnion is "incapable of operating its businesses lawfully."

*TransUnion's Security issues*

174. Upon information and belief, on October 13, 2017, the website for TransUnion's Central American division was reported to have been redirecting visitors to websites that attempted drive-by downloads of malware disguised as Adobe Flash updates.

175. Upon information and belief, the attack had been performed by hijacking third-party analytics JavaScript from Digital River brand FireClick.

176. Upon information and belief, on March 17, 2022, TransUnion South Africa disclosed that hackers breached one of their servers and allegedly stole data of 54 million customers, demanding a ransom to not release it, the group N4ughtysecTU claims responsibility

177. Upon information and belief, TransUnion is an artificial person.

178. Upon information and belief, TransUnion

179. Upon information and belief, TransUnion's Entity Name as registered with the New York Department of State is "TRANS UNION (OF DELAWARE), LLC[.]"

180. Upon information and belief, TransUnion's New York Department of State ID # is 2331915.

181. Upon information and belief, TransUnion's Foreign Legal Name as registered with the New York Department of State is "TRANS UNION LLC[.]"

182.  Upon information and belief, TransUnion's Entity Type as registered with the New York Department of State is "FOREIGN LIMITED LIABILITY COMPANY[.]"

183.  Upon information and belief, TransUnion's Section of Law as registered with the New York Department of State is "802 LLC – LIMITED LIABILITY COMPANY LAW[.]"

184.  Upon information and belief, TransUnion's Entity Status with the New York Department of State is Active.

185.  Upon information and belief, TransUnion's Date of Initial New York Department of State Filing is 1/6/1999.

186.  Upon information and belief, TransUnion's New York Department of State Effective Date Initial Filing is 1/6/1999.

187.  Upon information and belief, TransUnion's New York Department of State Foreign Formation Date is 12/03/1998.

188.  Upon information and belief, TransUnion's New York Department of State Statement Status is Current.

189.  Upon information and belief, TransUnion's New York Department of State County is Queens.

190.  Upon information and belief, TransUnion's New York Department of State Next Statement Due Date is 1/31/2025.

191.  Upon information and belief, TransUnion's Registered Agent's Name and Address, as registered with the New York Department of State, is:

　　　　a.  Name: "THE PRENTICE-HALL CORPORATION, INC.";

　　　　b.  Address: "80 STATE STREET, ALBANY, NY 12207-2543."

## IV.    STATUTORY FRAMEWORK

### *The FCRA*

192.    The Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, is federal legislation enacted to promote the accuracy, fairness, and privacy of consumer information contained in the files of consumer reporting agencies.

193.    The FCRA was intended to shield consumers from the willful and/or negligent inclusion of erroneous data in their consumer reports, which are also known as "credit reports."

194.    To that end, the FCRA regulates the collection, dissemination, and use of consumer information, including consumer credit information.

195.    Together with the Fair Debt Collection Practices Act, 15 U.S.C. 1692, *et seq.* ("FDCPA"), the FCRA forms the foundation of consumer rights law in the United States.

196.    The FCRA was originally passed in 1970, and is enforced by the U.S. Federal Trade Commission ("FTC"), the Consumer Financial Protection Bureau ("CFPB"), and private litigants.

### *History*

197.    Before standardization of credit scoring, statements of character were integral to credit reports well into the 1960s.

198.    With credit reports containing probing details about personality, habits, and health, in the hearings on the Fair Credit Reporting Act lawmakers were troubled that individuals were helpless to clear up errors.

199.    The Fair Credit Reporting Act, as originally enacted, was title VI of Pub. L. 91–508, 84 Stat. 1114, enacted October 26, 1970, entitled *An Act to amend the Federal Deposit Insurance Act to require insured banks to maintain certain records, to require that certain*

*transactions in United States currency be reported to the Department of the Treasury, and for other purposes*. It was written as an amendment to add a title VI to the Consumer Credit Protection Act, Pub. L. 90–321, 82 Stat. 146, enacted June 29, 1968.

200. The FCRA was one of the first data privacy laws passed in the Information Age.

201. The findings of the U.S. Congress that led to the Act and the FCRA's regulatory goals set the direction of information privacy in the U.S. and the world for the next sixty years.

202. Among these innovations were the determination that there should be no secret databases to make decisions about a person's life, individuals should have a right to see and challenge the information held in such databases, and that information in such a database should expire after a reasonable amount of time.

*Consumer reports*

203. Commonly referred to as credit reports, a consumer report "contains information about your credit—and some bill repayment history—and the status of your credit accounts. This information includes how often you make your payments on time, how much credit you have, how much credit you have available, how much credit you are using, and whether a debt or bill collector is collecting on money you owe. Credit reports also can contain rental repayment information if you are a property renter. It also can contain public records such as liens, judgments, and bankruptcies that provide insight into your financial status and obligations." [Source: "What is a credit report?" Consumer Financial Protection Bureau. Retrieved May 25, 2018.]

*Inaccuracies in consumer reports*

204. A 2015 study released by the Federal Trade Commission found that 23% of consumers identified inaccurate information in their credit reports. [Source: "Report to Congress

Under Section 319 of the Fair and Accurate Credit Transactions Act of 2003." Federal
Trade Commission. December 2012. Retrieved October 16, 2015.]

205.    Under the Fair and Accurate Credit Transactions Act ("FACTA"), an amendment to the
FCRA passed in 2003, consumers are able to receive a free copy of their consumer report
from each credit reporting agency once a year.

*Civil liability*

206.    The FCRA regulates: (1) Consumer reporting agencies; (2) Users of consumer reports;
and, (3) Furnishers of consumer information.

207.    If a consumer's rights under the FCRA are violated, they can recover: (1) Actual or
statutory damages; (2) Attorney's fees; (3) Court costs; and, (3) Punitive damages if the
violation was willful.

208.    "The threat of punitive damages under 1681n of the FCRA is the primary factor deterring
erroneous reporting by the reporting industry." *Brim v. Midland Credit Mgmt. Inc.*, 795
F.Supp.2d 1255 (N.D. Ala. 2011).

209.    The statute of limitations requires consumers to file suit prior to the earlier of: two years
after the violation is discovered; or, five years after the violation occurred.

210.    Consumer attorneys often take these cases on a contingency fee, or partial contingency
fee, basis because the statute allows a consumer to recover attorney's fees from the
offending party or parties.

*Users of consumer reports*

211.    Users    of    the    information    for credit, insurance,    or    employment    purposes
(including background checks) have the following responsibilities under the FCRA: (1)
Users can only obtain consumer reports for permissible purposes under the FCRA; (2)

Users must notify the consumer when an adverse action is taken on the basis of such reports; and, (3) Users must identify the company that provided the report, so that the accuracy and completeness of the report may be verified or contested by the consumer.

*Employment background checks*

212.   Employers using consumer reports to screen job applicants or employees must follow specific procedures: (1) Get your written permission; (2) Tell you how they want to use your credit report; (3) Not misuse your information; (4) Give you a copy of your credit report if the employer decides not to hire or fires you; and, (5) Give you an opportunity to dispute the information contained within your credit report before making a final adverse decision.

*Furnishers of information*

213.   A creditor, as defined by the FCRA, is a company that furnishes information to consumer reporting agencies. Typically, these are creditors, with which a consumer has some sort of credit agreement (such as credit card companies, auto finance companies and mortgage banking institutions).

214.   Other examples of information furnishers are collection agencies (third-party collectors), state or municipal courts reporting a judgment of some kind, past and present employers and bonders.

215.   Lenders have an important role to play in ensuring credit reports are accurate.

216.   Under the FCRA, creditors who furnish information about consumers to consumer reporting agencies must: (1) Provide complete and accurate information to the credit reporting agencies; (2) Investigate consumer disputes received from credit reporting agencies; (3) Correct, delete, or verify information within 30 days of receipt of a dispute;

and, (4) Inform consumers about negative information which is in the process of or has already been placed on a consumer's credit report within one month. *This notice doesn't have to be sent as a separate notice, but may be placed on a consumer's monthly statement. If sent as part as the monthly statement, it needs to be conspicuous, but need not be in bold type. Required wording developed by the US Federal Treasury Department.* Notice before negative information is reported: *We may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.* Notice after negative information is reported: *We have told a credit bureau about a late payment, missed payment or other default on your account. This information may be reflected in your credit report.*

### *Consumer reporting agencies ("CRAs")*

217. Consumer reporting agencies ("CRAs"), also referred to incorrectly as credit bureaus, are entities that collect and disseminate information about consumers to be used for credit evaluation and certain other purposes, including employment.

218. CRAs hold a consumer's credit report in their databases.

219. CRAs have a number of responsibilities under FCRA, including the following: (1) CRAs must maintain reasonable procedures to ensure the maximum possible accuracy of the information contained within a consumer's report; (2) Provide a consumer with information about him or her in the agency's files and take steps to verify the accuracy of information disputed by a consumer; (3) If negative information is removed as a result of a consumer's dispute, it may not be reinserted without notifying the consumer in writing within five days; and, (4) Remove negative information seven years after the date of first

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/08/2024

delinquency (except for bankruptcies (10 years) and tax liens (seven years from the time they are paid).

220.    The three big CRAs—Experian, TransUnion, and Equifax—do not interact with information furnishers directly as a result of consumer disputes. They use a system called E-Oscar.

221.    In some areas of the country, however, there are other CRAs.

*Nationwide specialty consumer reporting agencies*

222.    In addition to the three big CRAs, the FCRA also classifies dozens of other information technology companies as "nationwide specialty consumer reporting agencies" that produce individual consumer reports used to make credit determinations.

223.    Under Section 603 of the FCRA, the term "nationwide specialty consumer reporting agency" means a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis relating to: (1) Medical records or payments; (2) Residential or tenant history; (3) Check writing history; (4) Employment history; or, (4) Insurance claims.

224.    Because these nationwide specialty CRAs sell consumer reports, they are required to provide annual disclosures of their report files to any consumer who requests their files.

225.    A partial list of companies classified as nationwide specialty consumer reporting agencies under FCRA includes: Telecheck, ChoicePoint, Acxiom, Integrated Screening Partners, Innovis, the Insurance Services Office, Tenant Data Services, LexisNexis, Retail Equation, Central Credit, Teletrack, the MIB Group, United Health Group (Ingenix Division), and Milliman.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

226. Although the major CRAs Experian, Equifax, and TransUnion are required by law to provide a central source website for consumers to request their reports, the nationwide specialty consumer reporting agencies are not required to provide a centralized online source for disclosure.

227. The FCRA Section 612 merely requires nationwide specialty consumer reporting agencies to establish a streamlined process for consumers to request consumer reports, which shall include, at a minimum, the establishment by each such agency of a toll-free telephone number for such consumer disclosure requests.

*Identity theft*

228. Identity theft involves obtaining somebody else's identifying information and using it for a criminal purpose.

229. Most often that purpose is to commit financial fraud, such as by obtaining loans or credits in the name of the person whose identity has been stolen.

230. Stolen identifying information might also be used for other reasons, such as to obtain identification cards or for purposes of employment by somebody not legally authorized to work in the United States.

231. According to a United States Department of Justice study, in 2012 the direct and indirect cost of identity theft was estimated to be responsible for financial losses of $24.7 billion, approximately twice the $14 billion total cost of other property crimes.

232. By 2014, losses to identity theft decreased to $15.4 billion, mostly due to a reduction in the number of high-value losses (the top 10% of cases).

233. By 2016, the estimated cost of identity theft increased to $16 billion.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

234.    In 2012, identity theft affected approximately 16.6 million people, approximately 7% of the U.S. population aged 16 or older.

235.    In 2014, identity theft affected approximately 17.6 million people, again approximately 7% of the U.S. adult population.

236.    It was estimated that approximately one third of Americans affected by a data breach ended up becoming a victim of financial fraud in 2013, an increase from one ninth in 2010.

237.    When an existing credit card is exposed and then used for fraud, the average estimated loss is $1,251.

238.    When a Social Security number is exposed and then used to open new accounts, the average estimated loss increases to $2,330.

239.    In 2015, a private study performed by Javelin suggested that incidents of identity theft remained steady from 2014, and that the losses associated with each instance of identity theft had decreased slightly.

*Data breaches*

240.    For purposes of identity theft, data breaches involve the unauthorized access of consumer data contained on computer systems, with the data being potentially subject to use for purposes of identity theft.

241.    The Identity Theft Resource Center said there were 662 data breaches in the United States in 2010, almost a 33% increase from the previous year.

242.    Between January, 2015 and September, 2017, the Identity Theft Resource Center estimates that there were 7,920 breaches affecting more than one billion records that could lead to identity theft.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024

NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/08/2024

*IdentityTheft.gov*

243.    Upon information and belief, IdentityTheft.gov is an official website of the United States government.

244.    Upon information and belief, a ".gov" website belongs to an official government organization of the United States.

245.    Upon information and belief, IdentityTheft.gov belongs to the Federal Trade Commission ("FTC"), which is an official United States government agency.

246.    Upon information and belief, IdentityTheft.gov is the federal government's one-stop resource for identity theft victims.

247.    Upon information and belief, IdentityTheft.gov provides streamlined checklists and sample letters to give individuals through the recovery process.

248.    Upon information and belief, IdentityTheft.gov is the official website of the FTC dedicated to helping individuals who have been victims of identity theft.

249.    Upon information and belief, launched as part of the FTC's commitment to consumer protection, IdentityTheft.gov provides a comprehensive and user-friendly resource for victims to report and recover from identity theft incidents.

250.    Upon information and belief, key features and services of IdentityTheft.gov include:

   a.    *Report Identity Theft*: The website guides individuals through the process of reporting identity theft to the FTC and creating a personalized recovery plan. Victims can securely submit details of the theft, which helps law enforcement agencies investigate and prosecute identity thieves.

   b.    *Personalized Recovery Plan*: Upon reporting the theft, victims receive a step-by-step recovery plan tailored to their specific situation. The plan includes

guidance on actions to take, such as contacting creditors and credit bureaus, disputing fraudulent charges, and placing fraud alerts or credit freezes on their credit reports.

c. *Documenting Identity Theft*: IdentityTheft.gov provides tools to help victims document their identity theft experience, including printable affidavits and sample letters for communicating with creditors and other parties involved in the recovery process.

d. *Education and Prevention Resources*: The website offers educational resources on identity theft prevention, including tips on safeguarding personal information, recognizing common scams, and understanding consumer rights related to identity theft.

e. *Updates and Support*: Victims can track their recovery progress through the website and receive ongoing support and guidance from the FTC's Identity Theft Assistance Center.

f. *Free Resources*: All services provided by IdentityTheft.gov are free of charge to victims of identity theft.

251. Upon information and belief, overall, IdentityTheft.gov serves as a vital resource for individuals facing the challenges of identity theft, offering practical assistance, guidance, and support to help victims recover their identities and mitigate the impact of fraudulent activities.

252. Upon information and belief, IdentityTheft.gov underscores the Federal Trade Commission's commitment to combating identity theft and protecting consumers' financial well-being.

## V.   ADDITIONAL FACTUAL ALLEGTIONS

253.   Plaintiff repeats and realleges the allegations contained in paragraph 1 - 252 verbatim herein.

254.   Plaintiff has filed this action within 2 years of the date of discovery of FCRA violations.

255.   Plaintiff against Defendants, and each of them, asserts right(s) to relief jointly, severally, or in the alternative, arising out of the same transaction, occurrence, or series of transactions or occurrences, upon a common question of law under the FCRA or facts.

256.   Plaintiff legally maintained KeyBank checking account (*0935) that it closed in 2024.

257.   KeyBank communicated in writing to Early Warning that Plaintiff's KeyBank account (*0935) was closed due to "Checking Account Fraud," which KeyBank knows is false.

258.   Early Warning reported to third parties that Plaintiff's KeyBank account closed for fraud.

259.   KeyCorp, which owns/operates KeyBank is vicariously liable for KeyBank's conduct.

260.   As a direct and proximate result of KeyBank's alleged unlawful conduct listed above, Plaintiff has suffered, and continues to suffer, damages, including, but not limited to: anger, anxiety, decreased ability to focus on work tasks, frustration, confusion, severe emotional distress, negative emotions, headaches, and the inability to open bank accounts.

261.   Plaintiff's identity was stolen and the theft opened Ford Credit and Self Lender accounts.

262.   Plaintiff disputed in writing the Ford Credit and Self Lender account information subject to identity theft to TransUnion pursuant to the provisions of 15 U.S.C. § 1681c-2, by providing TransUnion with: (1) a copy of Mr. Keane's United States passport and New York driver's license as appropriate proof of Plaintiff's identity; (2) a copy of Mr. Keane's FTC Identity Theft Report Number 172105980; (3) the identification of the Ford Credit and Self Lender erroneous account information resulting from Mr. Keane's identity theft;

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

and (4) a statement by Mr. Keane that the Ford Credit and Self Lender information is not information relating to any transaction by him, but is information resulting from ID theft.

263.    Despite TransUnion receiving the above-listed information on or about April or May 2024, TransUnion failed to block the reporting of the Ford Credit and Self Lender accounts that resulted from alleged identity theft, not later than 4 business days after its receipt thereof.

264.    Upon information and belief, TransUnion received said disputes on or about April or May 2024, but failed to block the reporting of the Ford Credit and Self Lender accounts that resulted from alleged identity theft, and failed to promptly notify the furnishers of the Ford Credit and Self Lender information identified by Mr. Keane (1) that the information may be a result of identity theft; (2) that an identity theft report has been filed; (3) that a block has been requested under 15 U.S.C. § 1681c-2; and (4) of the effective dates of the block.

265.    TransUnion maintained and continues to maintain the Ford Credit and Self Lender information in its files concerning Plaintiff that TransUnion knows are not accurate data.

266.    TransUnion published and continues to publish consumer reports to third parties, including, but not limited to, creditors and potential creditors, that include the Ford Credit and Self Lender account information that TransUnion knows are not accurate data.

267.    As a direct and proximate result of TransUnion's alleged unlawful conduct listed above, Plaintiff's credit score has dropped from TransUnion maintaining the Ford Credit and Self Lender account information in its files concerning Plaintiff that it knows are not accurate, and publishing consumer reports to third parties, including, but not limited to, Fair Isaac Corporation, creditors and potential creditors, which negatively impacts Plaintiff's credit scores, and ability to obtain new credit and maintain current credit, resulting in denial or closure of credit due to the Ford Credit and Self Lender information.

## VI.    FIRST CAUSE OF ACTION

### (Declaratory Judgment Pursuant to NY CPLR § 3001 against Defendants)

268.    Plaintiff repeats and realleges the allegations contained in paragraph 1 – 267 verbatim.

269.    Plaintiff seeks a declaratory judgment to resolve questions concerning the respective rights, obligations, and duties of Plaintiff and Defendants EARLY WARNING SERVICES, LLC dba EARLY WARNING ("Early Warning"), KEYBANK NATIONAL ASSOCIATION dba KEYBANK and KEY BANK ("KeyBank"), KEYCORP dba KEYBANK and KEY BANK ("KeyCorp"), FORD MOTOR CREDIT COMPANY LLC dba FORD CREDIT ("Ford Credit"), and TRANS UNION (OF DELAWARE), LLC dba TRANSUNION ("TransUnion") (collectively hereinafter referred to as the "Defendants").

270.    Early Warning has prepared and published on or more consumer reports concerning Plaintiff, but failed to follow reasonable procedures to assure maximum possible accuracy of the KeyBank information allegedly concerning Plaintiff about whom the report relates.

271.    Plaintiff legally maintained a KeyBank checking account that did not close due to fraud.

272.    KeyBank is the wholly owned subsidiary of KeyCorp.

273.    The Ford Credit information in TransUnion's file for Plaintiff is a result of identity theft.

274.    The Ford Credit information in TransUnion's file for Plaintiff does not relate to any transaction by Plaintiff.

275.    The Self Lender information in TransUnion's file for Plaintiff is a result of identity theft.

276.    The Self Lender information in TransUnion's file for Plaintiff does not relate to any transaction by Plaintiff.

277.    TransUnion prepared and published on or more consumer reports concerning Plaintiff, but failed to follow reasonable procedures to assure maximum possible accuracy of the Ford Credit and Self Lender data concerning Plaintiff about whom the report relates.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

278.    WHEREFORE, Plaintiff prays that the Court enter judgment against Defendants, to wit:

   a.    For a judgment declaring that Defendant EARLY WARNING SERVICES, LLC dba EARLY WARNING prepared and published on or more consumer reports concerning Plaintiff, but failed to follow reasonable procedures to assure maximum possible accuracy of the KeyBank data concerning Plaintiff;

   b.    For a judgment declaring that Plaintiff legally maintained a checking account with Defendant KEYBANK NATIONAL ASSOCIATION dba KEYBANK and KEY BANK that did not close due to "Checking Account Fraud;"

   c.    For a judgment declaring that Defendant KEYBANK NATIONAL ASSOCIATION dba KEYBANK and KEY BANK is the wholly owned subsidiary of Defendant KEYCORP dba KEYBANK and KEY BANK;

   d.    For a judgment declaring that the Ford Credit information in Defendant TransUnion's file for Plaintiff ANTOINE KEANE is a result of identity theft;

   e.    For a judgment declaring that the Ford Credit information in Defendant TransUnion's file for Plaintiff does not relate to any transaction by Plaintiff;

   f.    For a judgment declaring that the Self Lender information in Defendant TransUnion's file for Plaintiff ANTOINE KEANE is a result of identity theft;

   g.    For a judgment declaring that the Self Lender information in Defendant TransUnion's file for Plaintiff does not relate to any transaction by Plaintiff;

   h.    For a judgment declaring that Defendant TransUnion prepared and published on or more consumer reports concerning Plaintiff ANTOINE KEANE, but failed to follow reasonable procedures to assure maximum possible accuracy of the Ford Credit and Self Lender data allegedly concerning Plaintiff.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM   INDEX NO. 156169/2024
NYSCEF DOC. NO. 1                                                      RECEIVED NYSCEF: 07/08/2024

## VII.    SECOND CAUSE OF ACTION

### (Violations of 15 U.S.C. § 1681e(b) against Defendants Early Warning and TransUnion)

279.    Plaintiff repeats and realleges the allegations contained in paragraph 1 – 264 verbatim.

280.    15 U.S.C. § 1681e(b) provides:

> Whenever a consumer reporting agency prepares a consumer report
> it shall follow reasonable procedures to assure maximum possible
> accuracy of the information concerning the individual about whom
> the report relates.

281.    Early Warning prepared consumer reports about Plaintiff and provided those reports to third parties in connection with Plaintiff's current and/or prospective banking institutions.

282.    The consumer reports published by Early Warning to third parties contained false, misleading, and/or incomplete information about Plaintiff, as follows:

        a.    The reports falsely state that Plaintiff's KeyBank checking account ending in *0935 was closed due to "Checking Account Fraud[.]"

283.    Early Warning violated 15 U.S.C. § 1681e(b) by preparing and publishing a consumer reporting without following reasonable procedures to assure maximum possible accuracy of the information allegedly concerning Plaintiff, including the KeyBank check fraud data.

284.    Plaintiff's KeyBank checking acct. *0935 was not closed due to Checking Account Fraud.

285.    As a result of Early Warning's conduct and actions, as set forth above, Plaintiff suffered actual damage(s), including, but not necessarily limited to the following:

        a.    The denial of bank account applications;

        b.    The review or closure of current bank accounts; and

        c.    Embarrassment, humiliation, anguish, distress, and anxiety.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

286. As previously set forth herein, when preparing consumer reports concerning Plaintiff, Early Warning lacked, and today continues to lack, any reasonable procedures to assure the maximum possible accuracy of the information concerning Plaintiff whom the reports relate(d).

287. Accordingly, Early Warning's conduct has violated, and continues to violate, 15 U.S.C. § 1681e(b).

288. Early Warning's failure to comply with 15 U.S.C. § 1681e(b) has been intentional and willful, and/or, at the very least, negligent.

289. As set forth hereinbefore, as a result of Early Warning's violation of 15 U.S.C. § 1681e(b), Plaintiff has been economically harmed to his detriment, and Plaintiff is entitled to recover actual damages, in an amount to be determined by the trier of fact, statutory damages in an amount to be determined by the trier of fact, statutory damages in an amount not less than $100 or more than $1,000 pursuant to 15 U.S.C. § 1681n, as well as the further relief set forth below.

290. In order to punish such conduct by Early Warning, and to deter it and others from engaging in similar practices hereafter, Plaintiff is entitled to an award of punitive damages, pursuant to 15 U.S.C. § 1681n, in an amount to be determined by the trier of fact, as well as the other relief as set forth below.

291. In addition, Plaintiff is entitled to an award of statutory attorney's fees pursuant to 15 U.S.C. § 1681n and/or 15 U.S.C. § 1681o.

292. TransUnion prepared consumer reports about Plaintiff and provided those reports to third parties in connection with Plaintiff's current creditors and/or prospective creditors.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1                                                    RECEIVED NYSCEF: 07/08/2024

293.    The consumer reports published by TransUnion to third parties contained false, misleading, and/or incomplete information about Plaintiff, as follows:

    a.  The reports falsely state that Plaintiff has, had, and/or is liable for a Ford Credit account;

    b.  The reports falsely state that Plaintiff has, had, and/or is liable for a Self Lender account.

294.    TransUnion violated 15 U.S.C. § 1681e(b) by preparing and publishing a consumer reporting without following reasonable procedures to assure maximum possible accuracy of the information allegedly concerning Plaintiff, including the Ford Credit and Self Lender information that is a result of identity theft and does not relate to transactions by Plaintiff.

295.    The Ford Credit and Self Lender data in TransUnion's file for Plaintiff is not information relating to any transaction(s) by Mr. Keane with Defendants Ford Credit and/or Self Lender.

296.    As a result of TransUnion's conduct and actions, as set forth above, Plaintiff suffered actual damage(s), including, but not necessarily limited to the following:

    a.  The denial of credit applications with prospective creditor(s);

    b.  The adverse review or closure of accounts with current creditor(s); and

    c.  Embarrassment, humiliation, anguish, distress, and anxiety.

297.    As previously set forth herein, when preparing consumer reports concerning Plaintiff, TransUnion lacked, and today continues to lack, any reasonable procedures to assure the maximum possible accuracy of the information concerning Plaintiff whom the reports relate(d).

298.    Accordingly, TransUnion's conduct has violated, and continues to violate, 15 U.S.C. § 1681e(b).

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1                                    RECEIVED NYSCEF: 07/08/2024

299. TransUnion's failure to comply with 15 U.S.C. § 1681e(b) has been intentional and willful, and/or, at the very least, negligent.

300. As set forth hereinbefore, as a result of TransUnion's violation of 15 U.S.C. § 1681e(b), Plaintiff has been economically harmed to his detriment, and Plaintiff is entitled to recover actual damages, in an amount to be determined by the trier of fact, statutory damages in an amount to be determined by the trier of fact, statutory damages in an amount not less than $100 or more than $1,000 pursuant to 15 U.S.C. § 1681n, as well as the further relief set forth below.

301. In order to punish such conduct by TransUnion, and to deter it and others from engaging in similar practices hereafter, Plaintiff is entitled to an award of punitive damages, pursuant to 15 U.S.C. § 1681n, in an amount to be determined by the trier of fact, as well as the other relief as set forth below.

302. In addition, Plaintiff is entitled to an award of statutory attorney's fees pursuant to 15 U.S.C. § 1681n and/or 15 U.S.C. § 1681o

303. WHEREFORE, Plaintiff requests entry of judgment in favor of Plaintiff ANTOINE KEANE and against Defendants EARLY WARNING SERVICES, LLC dba EARLY WARNING and TRANS UNION (OF DELAWARE), LLC dba TRANSUNION for:

    a. actual damages sustained by Mr. Keane as a result of the failure *or* damages of not less than $100 and not more than $1,000, whichever is greater;

    b. such amount of punitive damages as the court may allow;

    c. costs of this action together with reasonable attorney's fees as determined by the court, and

    d. such other and further relief that this Court may deem just and proper herein.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1                                   RECEIVED NYSCEF: 07/08/2024

## VIII.   THIRD CAUSE OF ACTION

*(Violations of NYFCRA, General Business Law § 380-J and General Business Law § 380-K against Defendants Early Warning and TransUnion)*

304.   Plaintiff repeats and realleges the allegations contained in paragraph 1 – 289 verbatim.

305.   NY GBL § 380-J(a) provides, in pertinent part, that: "No consumer reporting agency shall report or maintain in the file of a consumer, information . . . which it has reason to know is inaccurate."

306.   NY GBL § 380-J(e) provides, "Consumer reporting agencies shall maintain reasonable procedures designed to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

307.   NY GBL § 380-K provides, in part, "Every consumer or reporting agency shall maintain reasonable procedures designed to avoid violations of sections three hundred eighty-b, three hundred eighty-j and three hundred eighty-t of this article …."

308.   As previously set forth herein, Defendant Early Warning knew, or reasonably should have known, and today knows or reasonably should know, that its consumer reports concerning Plaintiff with the KeyBank "Checking Account Fraud" information are materially inaccurate, false, deceptive, incomplete, and misleading, for the reasons set forth above.

309.   Accordingly, Early Warning's activities have violated, and continue to violate, NY GBL § 380-J(a) and NY GBL § 380-K.

310.   In addition, for the reasons previously set forth herein, when preparing consumer reports, specifically those of Plaintiff, Early Warning lacked, and today continues to lack, any reasonable procedures to assure the maximum possible accuracy of the information concerning the individual(s) about whom the report(s) relate(d), including as to Plaintiff.

INDEX NO. 156169/2024
RECEIVED NYSCEF: 07/08/2024

311.   Accordingly, Early Warning's activities have violated, and today continue to violate, NY GBL § 380-J(e) and NY GBL § 380-K.

312.   As a result of Early Warning's knowledge of its responsibilities under the NYFCRA, Early Warning's failure to comply with its requirements as to Plaintiff has been intentional and willful, or, at the very least, negligent.

313.   As set forth hereinbefore, as a result of Early Warning's violation of NY GBL § 380-J and NY GBL § 380-K, Plaintiff has been economically harmed to his detriment, and Plaintiff is entitled to an award of actual damages in an amount to be determined by the trier of fact pursuant to NY GBL § 380-l and/or GBL § 380-M, as well as the other relief set forth below.

314.   Early Warning's continuing and ongoing failure to comply with NY GBL § 380-J and NY GBL § 380-K will, unless restrained and enjoined, cause Plaintiff harm in the future and, accordingly, Plaintiff is entitled to a permanent injunction barring Early Warning from issuing consumer reports about him which falsely state that Plaintiff's KeyBank account was closed due to "Checking Account Fraud."

315.   In order to punish such conduct by Early Warning, and to deter Early Warning and others from engaging in similar practices hereafter, Plaintiff is entitled to an award of punitive damages, pursuant to NY GBL § 380-L, in an amount to be determined by the trier of fact, as well as the other relief set forth below.

316.   Plaintiff is entitled to an award of statutory attorney's fees pursuant to NY GBL § 380-L.

317.   As previously set forth herein, Defendant TransUnion knew, or reasonably should have known, and today knows or reasonably should know, that its consumer reports concerning Plaintiff with the Ford Credit and Self Lender information, which were a result of ID theft,

are materially inaccurate, false, deceptive, incomplete, and misleading, for the reasons set forth above.

318.    Accordingly, TransUnion's activities have violated, and continue to violate, NY GBL § 380-J(a) and NY GBL § 380-K.

319.    In addition, for the reasons previously set forth herein, when preparing consumer reports, specifically those of Plaintiff, TransUnion lacked, and today continues to lack, any reasonable procedures to assure the maximum possible accuracy of the information concerning the individual(s) about whom the report(s) relate(d), including as to Plaintiff.

320.    Accordingly, TransUnion's activities have violated, and today continue to violate, NY GBL § 380-J(e) and NY GBL § 380-K.

321.    As a result of TransUnion's knowledge of its responsibilities under the NYFCRA, TransUnion's failure to comply with its requirements as to Plaintiff has been intentional and willful, or, at the very least, negligent.

322.    As set forth hereinbefore, as a result of TransUnion's violation of NY GBL § 380-J and NY GBL § 380-K, Plaintiff has been economically harmed to his detriment, and Plaintiff is entitled to an award of actual damages in an amount to be determined by the trier of fact pursuant to NY GBL § 380-l and/or GBL § 380-M, as well as the other relief set forth below.

323.    TransUnion's continuing and ongoing failure to comply with NY GBL § 380-J and NY GBL § 380-K will, unless restrained and enjoined, cause Plaintiff harm in the future and, accordingly, Plaintiff is entitled to a permanent injunction barring TransUnion from issuing consumer reports about him which falsely state that Plaintiff is responsible for Ford Credit and Self Lender accounts, which are erroneous as a result of identity theft.

324. In order to punish such conduct by TransUnion, and to deter TransUnion and others from engaging in similar practices hereafter, Plaintiff is entitled to an award of punitive damages, pursuant to NY GBL § 380-L, in an amount to be determined by the trier of fact, as well as the other relief set forth below.

325. Plaintiff is entitled to an award of statutory attorney's fees pursuant to NY GBL § 380-L.

326. WHEREFORE, Plaintiff requests entry of judgment in favor of Plaintiff ANTOINE KEANE and against Defendants EARLY WARNING SERVICES, LLC dba EARLY WARNING and TRANS UNION (OF DELAWARE), LLC dba TRANSUNION for:

    a. actual damages sustained by Mr. Keane as a result of Defendants Early Warning's and TransUnion's failure to comply with NY GBL § 380-J and NY GBL § 380-K;

    b. such amount of punitive damages as the court may allow;

    c. costs of this action together with reasonable attorney's fees as determined by the court;

    d. temporary restraining order to enjoin Defendants Early Warning and TransUnion from committing future violations of the law;

    e. preliminary injunction against Defendants Early Warning and TransUnion from committing future violations of the law during the pendency of this action; and

    f. permanent injunctive against Defendants Early Warning and TransUnion to forever enjoin them from committing future violations of the law against Plaintiff;

    g. such other and further relief that this Court may deem just and proper herein.

## IX. FOURTH CAUSE OF ACTION

*(Violation of New York General Business Law § 349 against Early Warning and TransUnion)*

327. Plaintiff repeats and realleges the allegations contained in paragraph 1 - 326 verbatim.

328. NY GBL § 349(a) bars "[d]eceptive acts or practices in the conduct of any business, trade or commerce in the furnishing of any service in this state[.]"

329. NY GBL § 349(h) provides that "any person who has been injured by reason of any violation of [their respective] section[s] may bring an action in his own name to enjoin such unlawful act or practice" as well as obtain actual damages, or fifty dollars, whichever is greater.

330. As set forth hereinbefore, Early Warning has engaged in deceptive acts and practices within the meaning of NY GBL § 349, namely, by making information available for sale to the public, as a consumer credit reporting agency, which is incomplete, inaccurate, and misleading, while, at the same time, falsely representing to third parties or the public that the information in its consumer reports is "accurate" and "complete" when it was not.

331. In addition, Early Warning's consumer file and consumer report generators, are deceptively created and designed to produce consumer files and consumer reports for every consumer, including Plaintiff, based solely on information furnished by its customers or subscribers regardless of the accuracy or completeness of the information.

332. Early Warning's conduct and practices, as set forth above, are directed at New York consumers generally.

333. As a consequence of deceptive business practices, Early Warning has caused both consumer injury and harm to Plaintiff, as set forth herein, as well as to the public interest.

334. As set forth hereinbefore, by reason of Early Warning's violation of NY GBL § 349, Plaintiff has been economically injured to his detriment, and is entitled either to actual

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM   INDEX NO. 156169/2024

NYSCEF DOC. NO. 1   RECEIVED NYSCEF: 07/08/2024

damages, in an amount to be shown according to proof, or to damages in an amount of $50 pursuant to NY GBL § 349(h), whichever is greater, as well as the other relief set forth below.

335. Early Warning's continuing and ongoing failure to comply with NY GBL § 349 will, unless restrained and enjoined, cause similar harm to other consumers and, accordingly, Plaintiff, acting as "Private Attorney's General," are entitled to a permanent injunction barring Early Warning from issuing consumer reports that include information about Plaintiff that falsely states that Plaintiff's KeyBank checking account was closed due to "Checking Account Fraud."

336. In addition, Plaintiff is entitled to an award of statutory attorney's fees against Early Warning pursuant to NY GBL § 349(h).

337. As set forth hereinbefore, TransUnion has engaged in deceptive acts and practices within the meaning of NY GBL § 349, namely, by making information available for sale to the public, as a consumer credit reporting agency, which is incomplete, inaccurate, and misleading, while, at the same time, falsely representing to third parties or the public that the information in its consumer reports is "accurate" and "complete" when it was not.

338. In addition, TransUnion's consumer file and consumer report generators, are deceptively created and designed to produce consumer files and consumer reports for every consumer, including Plaintiff, based solely on information furnished by its customers or subscribers regardless of the accuracy or completeness of the information.

339. TransUnion's conduct and practices, as set forth above, are directed at New York consumers generally.

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024

NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

340. As a consequence of deceptive business practices, TransUnion has caused both consumer injury and harm to Plaintiff, as set forth herein, as well as to the public interest.

341. As set forth hereinbefore, by reason of TransUnion's violation of NY GBL § 349, Plaintiff has been economically injured to his detriment, and is entitled either to actual damages, in an amount to be shown according to proof, or to damages in an amount of $50 pursuant to NY GBL § 349(h), whichever is greater, as well as the other relief set forth below.

342. TransUnion's continuing and ongoing failure to comply with NY GBL § 349 will, unless restrained and enjoined, cause similar harm to other consumers and, accordingly, Plaintiff, acting as "Private Attorney's General," are entitled to a permanent injunction barring Early Warning from issuing consumer reports that include information about Plaintiff that falsely states that Plaintiff has or is responsible for Ford Credit and Self Lender accounts that are, in fact, a result of identity theft and not due to any legal transactions with Plaintiff.

343. In addition, Plaintiff is entitled to an award of statutory attorney's fees against TransUnion pursuant to NY GBL § 349(h).

344. Early Warning's and TransUnion's alleged conduct herein was willfull and knowing.

345. WHEREFORE, Plaintiff requests entry of judgment in favor of Plaintiff ANTOINE KEANE and against Defendants EARLY WARNING SERVICES, LLC dba EARLY WARNING and TRANS UNION (OF DELAWARE), LLC dba TRANSUNION for:

    a.  actual damages sustained by Mr. Keane or $50, whichever is greater;

    b.  such amount of punitive damages as the court may allow;

    c.  costs of this action together with reasonable attorney's fees;

    d.  temporary, preliminary, and permanent injunctive relief to enjoin violations;

    e.  such other and further relief that this Court may deem just and proper herein.

## X.    FIFTH CAUSE OF ACTION
### *(Violation of 15 U.S.C. § 1681c-2 against Defendant TransUnion)*

346.   Plaintiff repeats and realleges the allegations contained in paragraph 1 - 345 verbatim.

347.   15 U.S.C. § 1681c-2(a) provides, "Except as otherwise provided in this section, a consumer reporting agency shall block the reporting of any information in the file of a consumer that the consumer identifies as information that resulted from an alleged identity theft, not later than 4 business days after the date of receipt by such agency of – (1) appropriate proof of identity of the consumer; (2) a copy of an identity theft report; (3) the identification of such information by the consumer; and (4) a statement by the consumer that the information is not information relating to any transaction by the consumer."

348.   15 U.S.C. § 1681c-2(b) provides, "A consumer reporting agency shall promptly notify the furnisher of information identified by the consumer under subsection (a) – (1) that the information may be a result of identity theft; (2) that an identity theft report has been filed; (3) that a block has been requested under this section; and (4) of the effective dates of the block."

349.   As hereinbefore alleged, Plaintiff disputed in writing the Ford Credit and Self Lender account information subject to identity theft to TransUnion pursuant to the provisions of 15 U.S.C. § 1681c-2(b), by providing TransUnion with:

   a.   (1) a copy of Mr. Keane's United States passport and New York driver's license as appropriate proof of Plaintiff's identity;

   b.   (2) a copy of Mr. Keane's FTC Identity Theft Report Number 172105980;

   c.   (3) the identification of the Ford Credit and Self Lender erroneous account information resulting from Mr. Keane's identity theft; and

        d.   (4) a statement by Mr. Keane that the Ford Credit and Self Lender information is not information relating to any transaction by him, but is information resulting from an alleged identity theft.

350.   Despite TransUnion receiving the above-listed information on or about April or May 2024, TransUnion failed to block the reporting of the Ford Credit and Self Lender accounts that resulted from alleged identity theft, not later than 4 business days after its receipt thereof.

351.   Upon information and belief, TransUnion received said disputes on or about April or May 2024, but failed to block the reporting of the Ford Credit and Self Lender accounts that resulted from alleged identity theft, and failed to promptly notify the furnishers of the Ford Credit and Self Lender information identified by Mr. Keane (1) that the information may be a result of identity theft; (2) that an identity theft report has been filed; (3) that a block has been requested under 15 U.S.C. § 1681c-2; and (4) of the effective dates of the block.

352.   TransUnion maintained and continues to maintain the Ford Credit and Self Lender information in its files concerning Plaintiff that TransUnion knows are not accurate data.

353.   TransUnion published and continues to publish consumer reports to third parties, including, but not limited to, creditors and potential creditors, that include the Ford Credit and Self Lender account information that TransUnion knows are not accurate data.

354.   TransUnion's herein alleged conduct has been knowing, willful, and, at least, negligent.

355.   WHEREFORE, Plaintiff requests that this Court enter judgment against TransUnion for:

        a.   actual damages or damages of not less than $100 and not more than $1,000;

        b.   such punitive damages as the court may allow;

        c.   costs of this action, together with reasonable attorney's fees TBD by the court;

        d.   such other and further relief that this Court may deem just and proper herein.

## XI.    SIXTH CAUSE OF ACTION
### *(Violation of 15 U.S.C. § 1681i against Defendant TransUnion)*

356.    Plaintiff repeats and realleges allegations contained in paragraph 1 through 355 verbatim.

357.    TransUnion violated 15 U.S.C. § 1681i on multiple occasions by failing to delete the inaccurate Ford Credit and Self lender data, which were the result of an alleged identity theft, in Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to Ford Credit or Self Lender or the furnisher of said information; by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's consumer file; and, upon information and belief, by relying upon a source it has reason to know is unreliable.

358.    As a result of this conduct, action, and inaction of TransUnion, Plaintiff suffered damages by loss of credit; loss of the ability to purchase and benefit from credit; and the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

359.    TransUnion's conduct, action, and inaction was willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

360.    In the alternative, TransUnion was negligent entitling Plaintiff to recovery actual damages under 15 U.S.C. § 1681o.

361.    Further, Plaintiff is entitled to recover costs and attorney's fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.

362.    Further, Plaintiff is entitled to recover costs and attorney's fees from TransUnion in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681o.

363.   WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in favor of Plaintiff ANTOINE KEANE and against Defendant TRANS UNION (OF DELAWARE), LLC dba TRANSUNION for:

    a.   Any actual damages sustained by Plaintiff ANTOINE KEANE as a result of TransUnion's failure to comply with 15 U.S.C. § 1681i or damages of not less than $100 and not more than $1,000;

    b.   Such amount of punitive damages as the court may allow;

    c.   The costs of this action, together with reasonable attorney's fees as determined by the court; and

    d.   Such other and further relief that this Court may deem just and proper herein.

## XII.    SEVENTH CAUSE OF ACTION
### *(Defamation (libel) against Defendants KeyBank, KeyCorp, Early Warning, and TransUnion)*

364.   Plaintiff repeats and realleges allegations contained in paragraph 1 – 363 verbatim herein.

365.   KeyBank made a written false statement to Early Warning stating that Plaintiff's checking account with KeyBank was closed in or about 2024 due to "Checking Account Fraud."

366.   For the purposes of New York defamation law and analysis, Plaintiff is a private figure.

367.   KeyBank willfully, knowingly, and intentionally made the alleged false statements herein.

368.   KeyBank's acts hurt Plaintiff causing his bank accounts to close and denials to open others.

369.   Defendant KeyBank is liable to Plaintiff for libel.

370.   KeyCorp wholly owns KeyBank and is vicariously liable for KeyBank's alleged conduct.

371.   Defendant KeyCorp. is liable to Plaintiff for libel.

372.   Early Warning made false written statements to third parties, including banks, stating that Plaintiff's checking account with KeyBank closed due to "Checking Account Fraud."

373.   Early Warning willfully, knowingly, and intentionally made the alleged false statements.

374. Early Warning's acts hurt Plaintiff causing bank accounts to close and denials with banks.

375. Defendant Early Warning is liable to Plaintiff for libel

376. TransUnion falsely published to third parties Ford Credit and Self Lender data on Plaintiff.

377. TransUnion willfully, knowingly, and intentionally made the hereinbefore alleged statements to third parties, including to Plaintiff's creditors and prospective creditors, knowing the Ford Credit and Self Lender data to be the result of an alleged identify theft and not from actual or legal transactions involving Plaintiff and Ford Credit or Self Lender.

378. Defendant TransUnion is liable to Plaintiff for libel.

379. WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants KeyBank, KeyCorp, Early Warning, and TransUnion for:

      a. Actual damages;

      b. Such amount of punitive damages as the court may allow; and

      c. Such other and further relief that this Court may deem just and proper herein.

## XIII.  JURY DEMAND

380. WHEREFORE, Plaintiff demands a trial by jury on all issues so triable on all causes of action.

Respectfully submitted,

Dated: New York, New York
July 5, 2024

Brian L. Ponder, Esq.
BRIAN PONDER LLP
745 Fifth Avenue, Suite 500
New York, New York 10151
Telephone: (646) 450-9461
Facsimile: (646) 607-9238 (not for service)
Email: brian@brianponder.com (not for service)
ATTORNEY FOR PLAINTIFF

FILED: NEW YORK COUNTY CLERK 07/05/2024 10:33 AM    INDEX NO. 156169/2024
NYSCEF DOC. NO. 1    RECEIVED NYSCEF: 07/08/2024

SUPREME COURT OF THE STATE OF NEW YORK
NEW YORK COUNTY

| | |
|---|---|
| ANTOINE KEANE,<br><br>                         Plaintiff,<br><br>           v.<br><br>EARLY WARNING SERVICES, LLC dba EARLY WARNING; KEYBANK NATIONAL ASSOCIATION dba KEYBANK and KEY BANK; KEYCORP dba KEYBANK and KEY BANK; FORD MOTOR CREDIT COMPANY LLC dba FORD CREDIT; TRANS UNION (OF DELAWARE), LLC dba TRANSUNION;<br><br>                      Defendants. | Index No.<br><br>**PLAINTIFF'S VERIFICATION PURSUANT TO NY CPLR § 3020** |

I, ANTOINE KEANE, swear, affirm, and declare under penalties of perjury and state:

1. I am the plaintiff in the above-entitled civil action;

2. I have read the foregoing **VERIFIED COMPLAINT AND JURY DEMAND** and know the contents thereof; and

3. The same are true to my knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe them to be true.

Dated: <u>July 5, 2024</u>

                                  *Antoine Keane*
                                 ANTOINE KEANE